ORAL ARGUMENT PRESENTED APRIL 8, 2013
OPINION ISSUED ON JULY 12, 2013

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

)
CENTER FOR BIOLOGICAL                        )
DIVERSITY, et al.,                           )
                                             )   No. 11-1101
        Petitioners,                         )
                                             )    (Consolidated with 11-1285,
    v.                                       )   11-1328, and 11-1336)
                                             )
UNITED STATES ENVIRONMENTAL                  )
PROTECTION AGENCY,                           )
                                             )
        Respondent.                          )
_____)


**PETITIONERS' CROSS-MOTION FOR IMMEDIATE ISSUANCE OF THE
MANDATE, IN RESPONSE TO RESPONDENT-INTERVENORS' MOTION
TO EXTEND THE DEADLINE TO PETITION FOR REHEARING OR IN
THE ALTERNATIVE TO HOLD CASE IN ABEYANCE**


Petitioners Center for Biological Diversity, Coastal Conservation

League, Conservation Law Foundation, Dogwood Alliance, Natural Resources

Council of Maine, Natural Resources Defense Council, Georgia ForestWatch

and Wild Virginia (collectively "Petitioners") respectfully submit this Cross-

Motion and Response to the Motion filed by Respondent-Intervenors

requesting the Court to further extend the time for filing petitions for

rehearing and/or rehearing en banc, or in the alternative to hold this case in

abeyance.  Doc. No. 1462487 (Oct. 22, 2013) (hereafter "Motion").  Counsel for

Petitioners contacted counsel for both Respondent EPA and Respondent-

Intervenors regarding this Cross-Motion and Response.  Counsel for

Respondent EPA stated that due to time constraints related to the request,

counsel was not able to ascertain EPA's position, and that the agency will

provide it to the Court by the deadline for replies.  Counsel for Respondent-

Intervenors stated that all Respondent-Intervenors would oppose the Cross-

Motion, save for the Renewable Fuels Association, which had not responded

prior to the filing deadline.

Absent immediate issuance of the mandate, granting either of

Respondent-Intervenors' requests would leave in effect for many months an

unlawful and now-vacated regulatory exemption with ongoing harmful

effects.  As set forth below and in the attached declarations, a further delay in

issuance of the mandate would allow numerous biomass-burning facilities

currently in the process of permitting and construction to continue relying on

an unlawful exemption from federal permitting requirements that are

2

applicable to all other similarly-polluting facilities of the same class.  Those

permitting requirements are designed to ensure that major sources

implement the best available control technology for all of their significant air

pollutant emissions.  A further delay in issuance of the mandate will likely

allow those facilities to emit greater amounts of pollution harmful to public

health and the climate than they will have if the Court's decision and vacatur

now take effect.

Petitioners recognize that the Supreme Court's pending review of an

issue in *Utility Air Regulatory Group v. EPA*, S. Ct. No. 12-1146, and

consolidated cases (hereinafter "*UARG*"), could materially affect the content of,

if not obviate the need for, a rehearing petition in this case.  Accordingly,

Petitioners do not oppose a further extension of the deadline for filing such a

petition.  No basis exists, however, for granting Respondent-Intervenors' more

extraordinary alternative request to hold this case in abeyance, as an

extension by itself would protect any interest they may have in seeking

rehearing based on the Supreme Court's disposition of *UARG*.

Accordingly, Petitioners respectfully submit that good cause exists for

immediate issuance of the mandate.

3

In support of this Cross-Motion and Response, Petitioners state as follows:

1.      The Court's decision of July 12, 2013 in this matter, *Center for Biological Diversity, et al. v EPA*, 722 F.3d 401 (D.C. Cir. 2013), vacated as unlawful an EPA rule exempting biogenic carbon dioxide from certain Clean Air Act permitting and control requirements for new and modified major sources of that pollutant.  That decision puts developers of new or modified stationary sources of biogenic carbon dioxide on the same footing as developers of all other stationary sources of carbon dioxide.  Because this Court's mandate has not yet issued, however, major sources of biogenic carbon dioxide are currently the *only* major sources of greenhouse gases not required to obtain pre-construction permits and implement the best available pollution control technology.

2.      Prior to construction or modification of stationary air polluting facilities, the Clean Air Act requires an evaluation of the source's potential to emit air pollutants.  Sources emitting pollutants above certain threshold amounts are required to seek and receive permits under the Prevention of Significant Deterioration ("PSD") and Title V programs.  PSD permits must reflect application of the "best available control technology" ("BACT"), which results in emissions limits for the carbon dioxide and other air pollutants

4

these sources emit in significant amounts.  *See Ctr. for Biological Diversity*, 722

F.3d at 404.  Covered sources must obtain permits before starting

construction.  *Id.*

3.     EPA's original Timing and Tailoring Rules applied these stationary

source preconstruction permitting requirements to all greenhouse gases,

including biogenic carbon dioxide, beginning January 2011, and to sources

that are major only for their greenhouse gas emissions, again including

biogenic carbon dioxide, as of July 1, 2011.  75 Fed. Reg. 31,514, 31,523,

31,590-91, 31,594 (June 3, 2010).  The now-vacated rule in this case

exempted sources that are major due solely to their biogenic carbon dioxide

emissions from the preconstruction permitting and control requirements.  *Ctr.*

*for Biological Diversity,* 722 F.3d. at 407.  Issuance of the mandate therefore

would restore the original requirement that major biogenic carbon dioxide

sources be  subject to PSD review and BACT emissions limitations.

4.      Ordinarily, the mandate effectuating this Court's vacatur of the

challenged rule would have issued within seven days of the denial of timely

petitions for rehearing and rehearing en banc, or by September 3, 2013 if no

such petitions were filed.  The mandate would have been further delayed only

in the event that such petitions, or a successful motion to stay the mandate,

were granted.  F. R.A. P. Rules 41(b) & (d)(1); D.C. Cir. R. 41(a)(1) & (a)(2)

(limiting a stay of the mandate to a period of 90 days in the ordinary course of events).

5.     In response to Respondent-Intervenors' first request, the Court extended the deadlines for rehearing petitions until 30 days after the Supreme Court's decision on petitions for certiorari seeking review of *UARG* . Per Curiam Order, Doc. No. 1453559 (Aug. 26, 2013).  Subsequently, on October 15, 2013, the Supreme Court issued a limited grant of certiorari on a single question, namely "[w]hether EPA permissibly determined that its regulation of greenhouse gas emissions from new motor vehicles triggered permitting requirements under the Clean Air Act for stationary sources that emit greenhouse gases."  Sup. Ct. Order List at 2-3 (Oct. 15, 2013) (granting certiorari in *UARG*).  Under this Court's extension order, petitions for rehearing and/or rehearing en banc are therefore due on November 14, 2013. Respondent-Intervenors filed this second request on October 22, 2013, now seeking to extend the deadlines for rehearing petitions until 30 days after the Supreme Court's decision on the merits in *UARG.*  Respondent EPA has not joined that request.

6.     Petitioners recognize that there is a possibility that the Supreme Court's decision in *UARG* "could" obviate the need for further proceedings in the present cases.  Motion at 4.  For example, the Supreme Court could

confirm this Court's holding that EPA's construction of the statute's plain text

was "unambiguously correct," *Coalition for Responsible Regulation v. EPA*, 684

F.3d 102, 113 (D.C. Cir. 2012), or otherwise uphold EPA's greenhouse gas

rules; such an outcome may convince Respondent-Intervenors not to seek

rehearing here.  Moreover, even if the Supreme Court were to hold that

greenhouse gas emissions alone do not "trigger" PSD permitting requirement

in the first instance, it nonetheless could conclude that major stationary

sources required to obtain pre-construction permits due to their potential

emissions of criteria pollutants must apply BACT controls for their

greenhouse gas emissions.  *See Coalition for Responsible Regulation v. EPA*,

2012 U.S. App. LEXIS 25997 *72-73 (D.C. Cir. Dec. 20, 2012) (Kavanaugh, J.,

dissenting from denial of rehearing and rehearing en banc).  This latter

outcome would not necessarily obviate the need for further proceedings here,

however, because EPA's vacated rule in this case unlawfully exempted

biogenic carbon dioxide from *both* permitting applicability determinations

*and* BACT requirements.  *See* Final Rule, 76 Fed. Reg. 43,490, 43,492/3, 43,507

(July 20, 2011).

　　　　7.　　The ultimate effect of *UARG* on this case is therefore a matter of

speculation.  Petitioners nonetheless do not oppose further extending the

deadline for filing petitions for rehearing or rehearing en banc.  No need or

basis exists, however, for the added step of ordering this matter held in abeyance, because extending the deadline for seeking reconsideration fully protects the Respondent-Intervenors' interest in rearguing their case in light of whatever action the Supreme Court takes in *UARG*.  At all events, abeyance is best suited to different circumstances than these.  Abeyance protects against duplicative or otherwise unnecessary litigation of a dispute, as where a parallel process furnishes an adequate forum.  *See, e.g., Basardh v. Gates*, 545 F.3d 1068, 1069 (D.C. Cir. 2008) (petition for direct appellate review held in abeyance while petitioner pursued habeas action in District Court that could moot the petition and Supreme Court had indicated habeas was the preferred course).  It also guards against adjudication where a jurisdictional question or some other fundamental doubt exists about deciding a matter.  *See, e.g., Westphal v. U.S. Dept. of Commerce*, 18 F.3d 950, 952 (D.C. Cir. 1994) (case held in abeyance pending another decision that clarified lack of jurisdiction).  Abeyance may be particularly appropriate where the moving party would likely succeed on the merits if the case proceeded.  *See Basardh*, 545 F.3d at 1069-70 ("there is ... a strong possibility that the government [seeking abeyance] will prevail" if the case proceeded).[1]  Here by contrast, the Court

---

[1] *Avista Corp. v. NRLB*, cited by Respondent-Intervenors as an instance of post-decisional abeyance, *see* Motion at 6-7, is inapposite, the court there having

has already decided the merits against the moving party, EPA (the primary

Respondent) does not join the motion, and all that remains is the Respondent-

Intervenors' effort to hold open the window for it to seek the extraordinary

process of reconsideration.

   8.    Respondent-Intervenors' speculation as to how the Supreme

Court might rule in *UARG* does not provide a basis for further delay of the

mandate in this case.  This Court adjudged EPA's biomass rule unlawful and

ordered vacatur on July 12, 2013, nearly four months ago.  As discussed below

and in the accompanying declaration, numerous facilities continue to proceed

through permitting and construction in reliance on that vacated exemption.

Respondent-Intervenors now candidly concede that part of what they seek is

a delay of the mandate.  *See* Motion at 6 ("an extension would also have the

effect of . . . postponing the issuance of the mandate").  Such a delay would

allow additional construction approvals in reliance on the now-vacated rule

for many more months.[2]  Given the speed at which such projects proceed to

---

acted on its own motion where a sister panel found that the U.S. Constitution
disqualified most members (and therefore the very competence to act) of the
respondent federal agency before it.

[2] Respondent-Intervenors previously assured this Court that their request for
an extension was *only t*hat, not a motion seeking to stay the mandate.
Respondent-Intervenors' Reply in Support, Doc. No. 1452579 at 2 (Aug. 20,
2013).  But their current request would effectively delay the mandate for far
longer than the 90-day ordinary maximum period allowed under F.R.A.P. Rule

construction, Decl. of Dr. Ranajit Sahu, attached hereto as Exh. 1, at ¶ E.4, this has the potential to result in significant additional harm to public health and the environment.[3]

9.    This Court's rules recognize that a party may at any time move for issuance of the mandate, for good cause shown.  D.C. Cir. R. 41(a)(1); *see also* FRAP 41(b) (recognizing the Court's retained discretion to shorten the time for issuing mandate).  The rules also contemplate situations in which the mandate issues prior to a grant of rehearing, even where it later might need to be recalled.  D.C. Cir. R. 41(a)(4).

10.    As set forth below, and in the declaration of Dr. Ranajit Sahu, the significant adverse health effects and additional carbon dioxide emissions that would occur from the extended delay sought by Respondent-Intervenors provide good cause for the immediate issuance of the mandate.  These effects will not end with the expiration of EPA's rule by its own terms.  Rather, they would continue far into the future, long after this case is over, because, as this Court correctly held, EPA's rule functions as a permanent exemption for any

---

41(d)(2)(B), where a request for a stay has been granted based on a showing of good cause.

[3] Such an outcome also could result in a far greater waste of judicial resources—specifically the resources already expended on briefing, arguing, and deciding this case—than Respondent-Intervenors postulate in their Motion.

biogenic carbon dioxide sources covered by it, once they are constructed. *Ctr. for Biological Diversity*, 722 F.3d at 408.

       9.    Biomass-fueled facilities emit large amounts of carbon dioxide, on the order of 100,000 tons per year, for boilers 7-8 MW in capacity or greater. Decl. of Dr. Mary S. Booth, ¶¶ 10, 23-24 (submitted with Petitioners' Opening Brief, and attached hereto as Exhibit 2). These facilities also emit a great deal of conventional air pollution that causes significant health effects. Sahu Decl. at ¶ D.1. Air pollution associated with a biomass facility that avoided full PSD review (and application of BACT) because of the unlawful exemption is less well-controlled than pollution from a PSD-permitted facility. Sahu Decl. at ¶ D.5, E. Additionally, a new facility relying on the unlawful exemption need apply no controls whatsoever for its emissions of biogenic carbon dioxide, even if that facility must obtain a PSD permit due to its emissions of other pollutants. If the mandate in this case does not issue, continued approvals to construct can be granted in reliance on the unlawful exemption, without carbon dioxide limits or adequate air pollution controls.

       10.    These concerns are far from theoretical. The now-vacated exemption already causes real harm to those living near facilities that received approvals in reliance on it. *See Ctr. for Biological Diversity*, 722 F.3d at 408; *see also* Petitioners' Final Opening Br. (Doc. 1385229) at 20-23 & Decl.

11

Addendum.  Information about the emissions profiles of the plants which have received approvals to construct, finished construction, and commenced operations since the exemption was illegally adopted vividly shows the harm that the exemption has caused by allowing these facilities to escape PSD review and application of BACT.  *See* Sahu Decl. at ¶¶E.1, E.8 and Table 3.  The vacated exemption also has allowed facilities subject to PSD permitting to avoid BACT for their biogenic carbon dioxide emissions, leaving those emissions essentially unregulated.  Booth Decl. at ¶ 36.  The approvals process for these plants can move rapidly.  *See, e.g.*, Sahu Decl. at ¶¶ E.1 (noting that the Allendale plant, which received construction approval right after the unlawful exemption was effective, is now operating), E.4-E.6.  Absent expedited issuance of the mandate, these harms will continue to occur—and in many cases may be effectively permanent.  *See Ctr. for Biological Diversity*, 722 F.3d at 408.

11.    Additional facilities are still in the pipeline.  Since the unlawful exemption was promulgated, at least 23 sources that are major for their biogenic carbon dioxide emissions have received construction approvals in reliance on it.  *See* Sahu Decl., ¶ E.3 & Table 2.  Those approvals do not provide for or include any control of the hundreds of thousands of tons per year of carbon dioxide the plants will emit, nor do they necessarily require BACT-

12

level pollution controls for other air pollutants like particulate matter and carbon monoxide.  Sahu Decl. at ¶ E.7; *see also* Booth Decl. at ¶ 36..

12.    Petitioners' expert declarant, Dr. Sahu, has analyzed data about pending biomass-fueled projects in detail.  Eight facilities have received construction approvals since January 2011, but have not yet commenced construction.  There are at least 15 additional facilities at various stages in the approval process that may be able to take advantage of the unlawful exemption until the mandate in this case issues.  Sahu Decl. at ¶ E.3,Table 2.

13.    Thus, issuing the mandate in this case will benefit persons living near these facilities, who would otherwise be harmed by incremental air emissions from plants that are permitted and constructed without PSD compliance.  Moreover, it will ensure that all major sources of carbon dioxide are on the same regulatory footing during the pendency of the Supreme Court's review.

CONCLUSION

For the reasons stated above, while Petitioners do not oppose Respondent-Intervenors' current Motion insofar as it seeks an extension of the deadline for filing petitions for rehearing or rehearing en banc, they do oppose holding this case in abeyance, and they further respectfully move this Court for immediate issuance of the mandate.

Respectfully submitted this 4th day of November, 2013:


//s// Ann Brewster Weeks
Ann Brewster Weeks
Clean Air Task Force
18 Tremont Street, Suite 530
Boston, MA 02108
Phone: (617) 624-0234 ext. 156
aweeks@catf.us

Counsel for Conservation Law
Foundation and Natural Resources
Council of Maine


//s// Frank Rambo (ABW)
Frank Rambo
Morgan Butler
Southern Environmental Law Center
201 West Main Street, Suite 14
Charlottesville, VA 22902
Phone: (434) 977-4090
frambo@selcva.org

Counsel for Coastal Conservation
League, Dogwood Alliance, Georgia
ForestWatch, and Wild Virginia


//s// Kevin Bundy (ABW)
Kevin Bundy
Vera P. Pardee
Brendan Cummings
Center for Biological Diversity
351 California Street, Suite 600
San Francisco, CA 94104
Phone: (415) 436-9682 ext. 313
kbundy@biologicaldiversity.org

Counsel for Center for Biological
Diversity


//s// David Doniger (ABW)
David Doniger
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
Phone: (202) 289-2403
ddoniger@nrdc.org

Nathaniel S.W. Lawrence (ABW)
Nathaniel S.W. Lawrence
Natural Resources Defense Council
3723 Holiday Drive, SE
Olympia, WA 98501
Phone: (360) 534-9900
nlawrence@nrdc.org

Counsel for Natural Resources
Defense Council

14

## CERTIFICATE OF SERVICE

I hereby certify that copies of the forgoing Cross-Motion for Immediate Issuance of the Mandate, in Response to Respondent-Intervenors' Motion To Extend the Deadline To Petition For Rehearing Or In The Alternative To Hold Case In Abeyance, were served, this 4th day of November 2013, through CM/ECF on all counsel of record.

/s/   Kevin Bundy